ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -                             )
                                         )
TYD Services                             )    ASBCA Nos. 64429, 64430
                                         )
Under Contract Nos.  W912ER-24-P-0005    )
                     W912ER-25-P-0004    )

APPEARANCE FOR THE APPELLANT:        Japdeep Kaur
                                       Managing Director

APPEARANCES FOR THE GOVERNMENT:      Michael P. Goodman, Esq.
                                       Engineer Chief Trial Attorney
                                     Katherine M. Smith, Esq.
                                       Engineer Trial Attorney
                                       U.S. Army Engineer District, Middle East

OPINION BY ADMINISTRATIVE JUDGE STINSON UNDER BOARD RULE 12.3

      Appellant TYD Services (TYD or appellant) appeals a contracting officer (CO) final decision (COFD) of a claim relating to two different contracts with the United States Army Corps of Engineers (USACE or government), Middle East District, for vehicle leasing and fleet services in the State of Qatar.  TYD elected to proceed pursuant to Board Rule 12.3, Accelerated Procedure.  Both parties agreed to waive a hearing and submit their respective positions on the written record under Board Rule 11.  Pursuant to Rule 12.3(c), the Board's decision "will normally be short and contain only summary findings of fact and conclusions."

FINDINGS OF FACT

The Two Vehicle Lease Contracts

      1.  On May 1, 2024, the government awarded TYD firm-fixed-priced Contract No. W912ER24P0005 (first contract) for the lease of 21 non-tactical sport utility vehicles for use by government personnel located at USACE Middle East District's Qatar Area Office at Al Udeid Air Base (R4, tab 1 at 1, 3-4; GPFOF ¶ 1). [1]

---

[1] The government submitted with its initial brief a detailed Proposed Findings of Fact (GPFOF) with citations to the record (gov't br. at 1-11), to which appellant responded in its reply brief (ARGPFOF) (app. reply at 4-9).

2. Following award of the first contract, the government issued three modifications (Modification Nos. P00001, P00002, and P00003), extending the period of performance a total of 14 months, from May 1, 2024, through July 2, 2025, with a total contract price of $218,066 (R4, tab 1 at 1, 4, 2 at 1, tab 3 at 1, tab 4 at 1-2; GPFOF ¶ 2). Including all modifications, the first contract contained four contract line-item numbers (CLINs), with the second CLIN - CLIN 0002[2] - being for "service and repair costs related to 'other than normal wear and tear' issues except cost covered by applicable warranties and/or insurance" up to an amount of $5,000 (R4, tab 1 at 3; GPFOF ¶ 3).[3]

3. On June 30, 2025, the government awarded TYD firm-fixed-priced Contract No. W912ER25P0004 (second contract) for the lease of 12 non-tactical sport utility vehicles also for use by government personnel at Al Udeid Air Base from July 2, 2025, to January 2, 2026, and with a total contract price of $57,456 (R4, tab 5 at 1-3, 5; GPFOF ¶ 14).

4. Both contracts contained a PERFORMANCE WORK STATEMENT (PWS) For Leased Non-Tactical Vehicles (NTV) with Maintenance Services (R4, tab 1 at 4-14, tab 5 at 4-15). Part 1, General Information, paragraph 1.5 Contracting Officer Representative [COR], states "[t]he COR will be identified at the time of award. A letter of appointment will be issued to the COR stating the responsibilities and limitations of the COR. The COR is not authorized to change any of the terms and conditions of the resulting order." (R4, tab 1 at 4, tab 5 at 6)

5. PART 2 – DEFINITIONS & ACRONYMS, paragraph 2.1, Definitions, provides, in part:

> **2.1.2. Contracting Officer (CO):** A person with authority to enter into, administer, and or terminate contracts, and make related determinations and findings on behalf of the USG [United States government]. Note: The Contracting Officer is the only individual who can legally bind the USG.
>
> **2.1.3. Contracting Officer's Representative (COR):** An employee of the USG appointed by the KO to administer

---

[2] Unlike the first contract, the second contract had no separate CLIN for service and repair costs related to other than normal wear and tear (R4, tab 5; GPFOF ¶ 16).

[3] In its reply brief, appellant admits almost uniformly the government's allegations regarding portions of the contracts as quoted by the government (*see* gov't br. at 1-5) but denies certain implications of that language (see app. reply at 3-5 (ARGPFOF ¶¶ 3-6, 8-12, 15-18, 20, 23-24)).

the PO. Such appointment shall be in writing and shall state the scope of authority and limitations. This individual has authority to provide technical direction to the Contractor as long as that direction is within the scope of the contract, does not constitute a change, and has no funding implications. This individual does NOT have authority to change the terms and conditions of the contract. A COR will be appointed for this contract.

(R4, tab 1 at 4-5, tab 5 at 6) (bold in original text)

6. PART 2, paragraph 2.1.8, defined "fair wear and tear" as "[t]he normal deterioration of items attributed to continuous usage," including "repair or replacement of all parts not resulting from abuse, accidents, criminal or hostile acts, or any event not at the fault of the USG" (R4, tab 1 at 5, tab 3 at 4, tab 4 at 4, tab 5 at 6; GPFOF ¶¶ 4, 15).

7. Section 2.1.8 also provided "[e]xamples of normal and fair wear and tear" including:

> *NTV Exterior* - Dents/Dings equal to or less than 152.4 millimeters, (6 inches) up to 10 dents/dings. **(Applies to entirety of vehicle excluding bumpers)** Includes any removal/repair due to the application of decals due to the austere environment, scratches will be evaluated on a case by case basis. Generally, scratches are considered fair wear and tear. Any and all bumper damage. Any and all damage to Running boards.
>
> Vehicle Interior - Seat rips/tears equal to or less than 25.4 millimeters, (1 inch) up to 10 rips/tears. 10 rips/tears is considered to be part of normal duties/operation of vehicle. Any seat rips/tears on seams. Soiled interiors with scratches on plastic components. Any and all damage/degradation to seatbelts. Damaged/degraded/ missing tool kit for changing spare tire. Missing ash trays, cigarette lighters or any other removable component to NTV.

(R4, tab 1 at 5, tab 3 at 4, tab 4 at 4, tab 5 at 7; GPFOF ¶¶ 5, 17)

8. PART 4 – CONTRACTOR FURNISHED ITEMS AND SERVICES, states that TYD was required to "provide all labor, material, equipment, tools, supervisions,

3

and other non-personal services necessary to maintain the vehicular leasing and maintenance requirements in an austere environment as defined in this PWS" (R4, tab 1 at 7, tab 3 at 6, tab 4 at 6, tab 5 at 9; GPFOF ¶¶ 7, 19). TYD also was "responsible for all unscheduled maintenance, to include all labor, equipment, parts, and materials" (R4, tab 1 at 12, tab 3 at 11, tab 4 at 11, tab 5 at 14; GPFOF ¶¶ 8, 20).

9. With respect to traffic accidents and incidents, PART 4 provided:

> **4.6 Safety:** . . . The driver shall be responsible to provide a police report in order for the Contractor to repair all vehicle damages. The driver shall provide a police report for all traffic incidents. If the driver does not provide a police report the driver will be liable for the full repairs cost and full traffic incident cost.
>
> . . . .
>
> **4.6.2 Accident Notification:** The Contractor will notify the identified Contracting Officer's Representative (COR) as soon as practical, but not later than eight hours, after notification of an accident which meets the definition of Recordable Injuries or Illnesses or High Visibility Accidents, property damage equal to or greater than $2,000. Immediate notifications to the Contracting Officer (KO), COR, and District/Division Safety Offices shall be made for all accidents noted in EM 385-1-1 paragraph 01-D-02 . . . . The Contractor shall ensure that recordable accident and property damage reports are complete and accurate.

(R4, tab 1 at 9-10, tab 3 at 8-9, tab 4 at 8, tab 5 at 11 (bold text in original); GPFOF ¶¶ 12, 24)

10. Neither contract placed a specific duty upon the government to provide police reports to the contractor (R4, tabs 1, 3-5; GPFOF ¶¶ 13, 25).

11. PART 5 – SPECIFIC TASKS, paragraph 5.2.4., provided that "[t]raffic fines and other traffic violations are the responsibility of the driver" and that the government would "attempt to coordinate settlement of any traffic fine notifications with government personnel; however, the government will have no liability for the fines" (R4, tab 1 at 11, tab 3 at 10, tab 4 at 9, tab 5 at 12; GPFOF ¶¶ 11, 23).

4

12. PART 5 also provided:

> **5.2.7** The Contractor and the COR shall perform a joint inspection prior to accepting a vehicle from the Contractor and prior to the Contractor accepting the vehicle from the Government. Any damage shall be documented by photographs and in writing and shall include the date of the inspection and signatures of the individuals performing the inspection. The report shall be submitted to the COR and KO within 10 calendar days after the inspection. The COR shall maintain records of contractor-provided vehicles to the Government to include the vehicle identification number. Vehicles that are replaced and/or loaned to the U.S. Government for any reason will be recorded on the vehicle report. The COR shall provide the Contractor a copy of the vehicle report on a monthly basis.

(R4, tab 1 at 11, tab 5 at 13) (bold text in original)

13. PART 6 - MAINTENANCE AND SERVICE, provided that "[t]he costs of unscheduled maintenance shall be that of the Contractor unless the maintenance is caused by other than fair wear and tear" (R4, tab 1 at 11-12, tab 3 at 11, tab 4 at 11, tab 5 at 14; GPFOF ¶¶ 9, 21). Under both contracts, the government was "responsible for service and repair costs related to 'other than normal wear and tear' issues except cost covered by applicable warranties and/or insurance" (R4, tab 1 at 12, tab 3 at 11, tab 4 at 11, tab 5 at 14; GPFOF ¶¶ 10, 22).

14. PART 6, section 6.2.3., states that "Windshields [sic] and windows cracked or chipped due to rocks or other objects will be considered 'normal wear and tear'" (R4, tab 1 at 12, tab 3 at 11, tab 4 at 11, tab 5 at 14; GPFOF ¶¶ 6, 18).

15. Both contacts identified Leslie F. Ligot as the COR (R4, tab 1 at 15, tab 3 at 13-14, tab 4 at 13, tab 5 at 17).

<u>TYD's Claim</u>

16. By email dated November 26, 2025, TYD submitted its claim to the CO for "incidental charges" and requested a COFD (R4, tab 6 at 1, tab 7 at 1, 5; GPFOF ¶ 26).

17. The claim asserted government liability for alleged "unpaid vehicle damage and fine charges" under both contracts (R4, tab 6 at 1, tab 7 at 1; GPFOF ¶ 27).

5

18. In support of its claim, TYD provided inspection reports, photographs, and invoices for alleged repair work for seventeen vehicles (see R4, tabs 8-24), as well as a table summarizing the alleged damages sustained (R4, tab 26; GPFOF ¶ 28). On the third page of each of the inspection reports are notations appearing beneath the statement "Vehicle damages, excluding normal wear and tear (attach pictures if possible)" setting forth specific damage to the vehicles, with a signature that appears to state "Leslie" (some reports more clearly than others) and a corresponding date (either "27-MAR-2025" or "02-09-2025") (R4, tab 8 at 3, tab 9 at 3, tab 10 at 3, tab 11 at 3, tab 12 at 3, tab 13 at 3 (displaying a single signature and the date "27-Mar-2025"), tab 14 at 3, tab 15 at 3, tab 16 at 3, tab 17 at 3, tab 18 at 3, tab 19 at 3, tab 20 at 3, tab 21 at 3, tab 22 at 3, tab 23 at 3, tab 24 at 3 (displaying a single signature and the date "02-09-2025" – which is September 9, 2025). The record does not reflect who annotated the inspection reports listing vehicle damage. [4]

### Alleged Damage to Vehicles Under First Contract

19. TYD identified seven vehicles under the first contract with alleged damage (license plate nos. 298385, 250857, 336478, 167911, 832139, 763885, and 835197) (R4, tabs 8-14; GPFOF ¶ 29).

20. Based upon the vehicle incident report provided by TYD, upon return, vehicle 298385 had "visible scratches" on the driver's side door (R4, tab 8 at 3). According to the government, the corresponding photos provided by TYD depict what appears to be either a single, approximately two-inch-high scratch, or leftover residue from a decal (R4, tab 8 at 4; GPFOF ¶ 30).[5] According to TYD, the government's "statement that the mark appears to be residue is speculation," and that "TYD's return-condition documentation identifies visible scratches after Government use, and the contemporaneous joint inspection record did not classify the condition as decal residue, removable mark, or fair wear and tear" (ARGPFOF ¶ 30). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of

---

[4] Neither party identifies the individual(s) who annotated the reports with the listed vehicle damage.

[5] As noted above, appellant did not discuss or provide record citation to any actual "supporting documentation" (the "vehicle incident report") regarding the specifics of its claims until submission of its reply brief (see app. br. at 3, app. reply at 3-9). Regarding appellant's discussion in its reply brief of the "supporting documentation" set forth in the government's proposed findings (gov't br. at 6-9), appellant challenges not the description of the damages as set forth and quoted by the government, but, rather, denies that the damages as alleged reflect ordinary dust, dirt, or fair wear and tear (app. reply at 6-8 (ARGPFOF ¶¶ 30-36, 38-47)).

normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

21. The vehicle incident report for vehicle 250857 states that the vehicle had "visible deep scratches" on the "front bumper" (R4, tab 9 at 3; GPFOF ¶ 31). According to the government, the photos show two approximately two-inch-wide scratches on the front bumper (R4, tab 9 at 4; GPFOF ¶ 31). According to appellant, "TYD's incident report, photograph, and invoice support that these were documented return-condition damages after Government use" (ARGPFOF ¶ 31). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

22. The vehicle incident report for vehicle 336478 states that the vehicle had a "dent on [the] tailgate," "deep scratches on [the] rear bumper," "deep scratches" on the "rear left door," and a "visible chip" on the "front bumper" (R4, tab 10 at 3; GPFOF ¶ 32). According to the government, the photos show a dent under six inches on the tailgate, a horizontal scratch under six inches on the tailgate, small scratches or chips on the rear bumper, and small scratches (one inch or less) above a tire ostensibly on the left rear door (R4, tab 10 at 4; GPFOF ¶ 32). According to appellant, the government "improperly minimizes the damage by focusing on size while ignoring the nature, number, and repair cost of the damaged areas" (ARGPFOF ¶ 32). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

23. The vehicle incident report for vehicle 167911 states that the vehicle had "visible stains" on the front passenger seat and rear seats, and "minor scratches" on the "right side mirror" and "rear bumper" (R4, tab 11 at 3; GPFOF ¶ 33). According to the government, the photos show what appears to be dust and dirt (and not stains) from the austere desert environment on the interior seats, and not stains, as well as minor scratches on the rear bumper (R4, tab 11 at 4; GPFOF ¶ 33). According to appellant, "TYD's incident report identified stains and scratches, and the contemporaneous return documentation did not classify the stains as ordinary dust, removable dirt, or pre-existing condition" (ARGPFOF ¶ 33). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

24. The vehicle incident report for vehicle 832139 states that the vehicle had "stains" on the "front right passenger seat" (R4, tab 12 at 3; GPFOF ¶ 34). According to the government, the photos show staining on one of the interior seats, likely from dust and dirt due to the austere desert environment (R4, tab 12 at 4; GPFOF ¶ 34). According

7

to appellant, "TYD's incident report identified stains, and the contemporaneous return documentation did not classify the condition as ordinary dust, removable dirt, or fair wear and tear" (ARGPFOF ¶ 34). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

25. The vehicle incident report for vehicle 763885 states that the vehicle had a "dent on [the] tailgate," "deep scratches on [the] rear bumper," "deep scratches" on the "rear left door," and a "visible chip" on the "front bumper" (R4, tab 13 at 3; GPFOF ¶ 35). According to the government, the photos show what appears to be dust or dirt (not a stain) from the austere environment on one of the interior seats, as well as minor chips on the rear bumper (R4, tab 13 at 4; GPFOF ¶ 35). According to appellant, "TYD's incident report [describes] a dent, deep scratches, and a visible chip by later characterizing the photographs as dust, dirt, or minor chips," and that the government's "description is selective and does not prove fair wear and tear" (ARGPFOF ¶ 35).[6] We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

26. The vehicle incident report for vehicle 835197 states that the vehicle had "deep scratches on [the] left rear door and driver's door," "visible scratches" on the "front bumper," a "minor dent on [the] rear left door," and "stains" on a "rear seat" (R4, tab 14 at 3; GPFOF ¶ 36). According to the government, the photos show minor chips or scratches on one door, all under one inch in diameter, and a minor dent on one door, under one inch (R4, tab 14 at 4; GPFOF ¶ 36). There are no photos of the interior of vehicle 835197 (R4, tab 14 at 4; GPFOF 36). According to appellant, "[t]he absence of certain photographs does not disprove TYD's incident report or invoice," and, instead, "TYD relies on the vehicle-specific incident report, invoice, and return-condition documentation for this damage" (ARGPFOF ¶ 36). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of

---

[6] We note that page 3 of the report for vehicle 336478 appears to be an exact duplicate of page 3 attached to the report for vehicle 336478 - with the exact same notations in the exact same handwriting (compare R4, tab 10 at 3, with R4, tab 13 at 3). In addition, TYD's invoices for the two vehicles seeks the same reimbursement - $2400 for both vehicles - and list the same types of damage to both vehicles (R4, tab 10 at 1, tab 13 at 1). Yet the photos of vehicle 763885 (tab 13 at 4) do not match the damage identified in the report, thus raising the document's questionable evidentiary value.

8

normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

Alleged Damage to Vehicles Under Second Contract

27. TYD identified under the second contract ten vehicles with alleged damage (license plate nos. 956696, 867476, 907233, 956704, 853367, 887282, 219225, 889563, 956694, and 959272) (R4, tabs 15–24; GPFOF ¶ 37).

28. The vehicle incident report for vehicle 956696 states that the vehicle had "visible scratches" on the "front bumper," a "scratch and crack" on the "rear left fender," and a "crack" on the "rear bumper" (R4, tab 15 at 3; GPFOF ¶ 38). According to the government, the photos show small scratches on the rear bumper and scratches on the front bumper (R4, tab 15 at 4; GPFOF ¶ 38). According to appellant, "cracked body parts, cracked bumper areas, and documented scratches are [not] ordinary fair wear and tear," and "[a] crack is physical damage requiring repair, not normal deterioration" (ARGPFOF ¶ 38). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

29. The vehicle incident report for vehicle 867476 states that the vehicle had "visible scratches" on the "front right door" (R4, tab 16 at 3; GPFOF ¶ 39). According to the government, the photos show small scratches or chips on one of the exterior doors, each under one inch in diameter (R4, tab 16 at 4; GPFOF ¶ 39). According to appellant, "TYD's vehicle-specific incident report and return documentation support that the damage was recorded after Government use" (ARGPFOF ¶ 39). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

30. The vehicle incident report for vehicle 907233 states that the vehicle had "damage and scratches on [the] rear bumper" (R4, tab 17 at 3; GPFOF ¶ 40). According to the government, the photos show small chips and scratches on the rear bumper, each under one inch in diameter (R4, tab 17 at 4; GPFOF ¶ 40). According to appellant, "the damage is [not] ordinary fair wear and tear merely because the Government describes it as small chips and scratches," and "TYD documented damage after Government use, and the return-condition documentation and invoice support TYD's claimed cost" (ARGPFOF ¶ 40). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

31. The vehicle incident report for vehicle 956704 states that the vehicle had a "visible chip on [the] front right door." (R4, tab 18 at 3; GPFOF ¶ 41). According to the government, the photos show a single small scratch or chip - less than one inch in diameter - on the exterior of the vehicle (R4, tab 18 at 4; GPFOF ¶ 41). According to appellant, "[a] visible chip is damage to the vehicle's exterior finish or body condition," and "TYD's vehicle-specific incident report and return documentation support that the chip was recorded after Government use" (ARGPFOF ¶ 41). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

32. The vehicle incident report for vehicle 853367 states that the vehicle had "stains" on the "driver" and "mid row seat[s]" and "visible scratches" on the "front bumper." (R4, tab 19 at 3; GPFUF ¶ 42). According to the government, the photos show four small stains, likely from dust and dirt due to the austere desert environment, on a single interior seat and small scratches on the front bumper (R4, tab 19 at 4; GPFOF ¶ 42). According to appellant, "TYD's incident report identified stains and scratches, and the contemporaneous return documentation did not classify the stains as ordinary dust, removable dirt, or pre-existing condition" (ARGPFOF ¶ 42). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

33. The vehicle incident report for vehicle 887282 states that the vehicle was "missing" a "fuel tank door cover lock." (R4, tab 20 at 3; GPFOF ¶ 43). According to the government, the photos "show an open fuel tank cover and an otherwise unremarkable exterior" (R4, tab 20 at 4; GPFOF ¶ 43). According to appellant, "[a] missing fuel tank door cover lock is not normal deterioration from continuous use," and the government's "statement that the exterior was otherwise unremarkable does not answer the missing part" (ARGPFOF ¶ 43). Appellant's invoice seeks $250 for a "FUEL TANK COVER" yet the photo depicts the opened fuel tank cover still attached to the car, with a round hole apparently for the lock (R4, tab 20 at 1, 4). Although arguably part of the vehicle's exterior, the missing lock is akin to the type of normal fair wear and tear described for vehicle interior, re, "'[d]amaged/degraded/missing tool kit for changing spare tire," and "[m]issing ash trays, cigarette lighters or any other removable component to NTV" (finding 7). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

34. The vehicle incident report for vehicle 219225 states that the vehicle had a "visible scratch" on the "left rear door" and the "plastic" of the "rear tools console cover" was "broken" (R4, tab 21 at 3; GPFOF ¶ 44). According to the government,

10

the photos "show a scratch under six inches in diameter on one of the exterior doors, and cracked plastic on the rear interior near the cargo organizer compartment" (R4, tab 21 at 4; GPFOF ¶ 44). According to appellant, a "broken component is damaged property, not normal deterioration," and the government's "focus on the scratch size does not excuse the broken plastic component" (ARGPFOF ¶ 44). The cracked plastic between the bumper and the cargo compartment appears to be damage from continuous usage in an austere environment, and "not resulting from abuse, accidents, criminal or hostile acts, or any event not the fault of the USG" (findings 6-7). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

35. The vehicle incident report for vehicle 889563 states that the vehicle had a "stain" on the "front right seat," a "minor tear" on the "rear mid row seat," and "running board plastic" that was "broken" on the "right side" (R4, tab 22 at 3; GPFOF ¶ 45). According to the government, the photos show a single small stain on one of the interior seats, less than three inches in diameter, a minor tear on another interior seat, approximately one inch in diameter, and broken plastic running board (R4, tab 22 at 4; GPFOF ¶ 45). According to appellant, a "broken running board plastic component is damaged property," a "seat tear and stain are return-condition damage," and the government's "attempt to minimize the items as small does not prove they were normal deterioration, removable dirt, or pre-existing condition" (ARGPFOF ¶ 45). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

36. The vehicle incident report for vehicle 956694 states that the vehicle had a "visible chip on [the] rear right fender" (R4, tab 23 at 3; GPFOF ¶ 46). According to the government, the photos show a single minor chip on the vehicle exterior, less than one inch in diameter (R4, tab 23 at 4; GPFOF ¶ 46). According to appellant, "TYD's vehicle-specific incident report and return documentation support that the chip was recorded after Government use" (ARGPFOF ¶ 46). We have reviewed the photos and inspection reports and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

37. The vehicle incident report for vehicle 959272 states that the vehicle had "stains" on the "rear seats" (R4, tab 24 at 3; ¶ GPFOF 47). According to the government, the photos "show what appears to be dust and dirt from the austere desert environment on the interior seats" (R4, tab 24 at 4; ¶ GPFOF 47). According to appellant, "TYD's incident report identifies stains, and the contemporaneous return documentation did not classify them as ordinary dust, removable dirt, or pre-existing condition" (ARGPFOF ¶ 47). We have reviewed the photos and inspection reports

and find that, applying the contracts' definitions of normal and fair wear and tear, the vehicle damage described is, more likely than not, normal and fair vehicle wear and tear.

38. TYD also provided documentation related to a traffic violation, including a paid invoice for the related fine in the amount of 500 Qatari Riyals (R4, tab 25; GPFOF ¶ 48; ARGPFOF ¶ 48). The vehicle tied to the traffic fine - identified by license plate no. 867476 - was under the second contract (R4, tab 16 at 1, tab 25 at 1; GPFOF ¶ 49; ARGPFOF ¶ 49).

39. TYD claimed that "[u]nder Qatari law and practice, a police accident report is mandatory for accident damage to be processed and repaired under insurance" (R4, tab 7 at 4; GPFOF ¶ 50; ARGPFOF ¶ 50). According to TYD, the government failed "to secure and provide the required police reports," which "caused the [vehicle] repairs to fall outside insurance coverage" (R4, tab 7 at 4; GPFOF ¶ 50; ARGPFOF ¶ 50).

CO Final Determination

40. On December 30, 2025, the CO issued what it captioned as a "Final Determination" regarding appellant's claim for incidentals, finding "that the damages claimed by TYD Services fall within the scope of 'normal' or 'fair wear and tear' as defined by the contractual provisions" and, therefore, TYD was not entitled to costs related to such fair wear and tear (R4, tab 27 at 1-2). Additionally, the CO found that, under the terms of the contracts, "'[t]raffic fines and other traffic violations are the responsibility of the driver' and 'the government will have no liability for the fines'" (R4, tab 27 at 2).

Notice of Appeal

41. On December 31, 2025, TYD submitted a notice of appeal under both contracts, which the Board docketed as two separate appeals, ASBCA No. 64429 for Contract No. W912ER-24-P-0005, and ASBCA No. 64430 for Contract No. W912ER-25-P0004. Both appeals were then consolidated.

TYD's Consolidated Complaint/Government Answer/Witness Statement

42. On January 8, 2026, the Board filed TYD's consolidated complaint. In ASBCA No. 64429, TYD alleges entitlement to $9,172 for costs incurred under the first contract, comprised of $8,950 in "accident damage repairs and related damage incidentals" and $222 "for traffic fines" (compl. ¶ 19). In ASBCA No. 64430, TYD alleges entitlement to $8,995 in costs under the second contract for "accident damage repairs and related damage incidentals" (compl. ¶ 24). TYD also alleges that the government failed to cooperate by "fail[ing] to obtain and provide required police

12

accident reports for incidents occurring during Government custody," which "prevented TYD from using the ordinary insurance and authorized workshop process in Qatar and . . . caused TYD to incur out of pocket repair costs" (compl. ¶ 27).

43. TYD's complaint also alleges that "TYD and the Government conducted joint inspections at vehicle issue and at turn in," and that "[t]he inspection sheets were signed by both parties and document vehicle condition at delivery and at return, including damage noted at turn in" (compl. ¶ 8). The government's answer admits that "that inspections were conducted at NTV issue and turn in," but denies that TYD "was present during the inspections," stating instead that "[t]he parties present were a representative from the Government, then-Contracting Officer Representative ("COR") Leslie Ligot, and a representative from Point Junction Car Rental" (answer ¶ 8). The government likewise "denies that both parties signed the inspection sheets," and that a government "representative, then-COR Leslie Ligot, signed the inspection sheets; no other signatures are present" (*id.*; *see* findings 15, 18).

44. Included in the Rule 4 file is a "WITNESS STATEMENT OF JESSICA TAL REGARDING TRAFFIC FINES" dated March 3. 2026 (R4, tab 33). The statement, by Ms. Tal, TYD's Chief Operation Officer and the author of appellant's briefs, provides, in part, that "there were instances in which traffic fines incurred during Government use were, in practice, paid by the Government/unit" (R4, tab 33 at 3-4 (Jessica Tal Statement)).

## DECISION

### I. Standard of Review

As noted above, the parties agreed to submit this appeal on the record pursuant to Board Rule 11, which provides that "[t]he weight to be given to any evidence [rests] within the discretion of the Board" and thus allows the Board to "make findings of fact on disputed facts." Board Rule 11(d); *Wright Bros., the Bldg. Co., Eagle LLC*, ASBCA No. 62285, 23-1 BCA ¶ 38,255 at 185,776 (quoting *U.S. Coatings Specialties & Supplies, LLC*, ASBCA No. 58245, 20-1 BCA ¶ 37,702 at 183,031).

### II. Burden of Proof

As the party asserting the claim, TYD has the burden of proof. *GLJ, Inc.*, ASBCA No. 62964, 22-1 BCA ¶ 38,121 at 185,184 (citations omitted). Specifically, TYD "has the burden of proving the fundamental facts of liability and damages de novo." *Id.* (quoting *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc)). TYD must establish three necessary elements, "liability, causation, and resultant injury." *Id.* (quoting *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed. Cir. 1991)). The contracts defined fair wear and tear as "[t]he normal deterioration of items attributed

to continuous usage," including "repair or replacement of all parts not resulting from abuse, accidents, criminal or hostile acts, or any event not at the fault of the USG" (finding 6). Accordingly, TYD had the burden of establishing that the vehicle damage reflected on the inspection reports was other than normal, fair wear and tear, as those terms were defined by the contracts.

### III. TYD Has Failed to Meet its Burden of Establishing Vehicle Damage Was Other Than Normal and Fair Wear and Tear

Pursuant to both contracts, exterior normal and fair wear and tear specifically included (1) dents, dings equal to six inches or less with up to ten dents/dings per vehicle, (2) removal/repair due to the application of decals due to the austere environment (3) scratches evaluated on a case by case basis, but generally, scratches are considered fair wear and tear, (4) any and all bumper damage, (5) any and all damage to running boards, and (6) cracked or chipped windows/windshield due to rocks or other objects (findings 7, 14). Interior normal and fair wear and tear specifically included (1) seat rips/tears equal to or less one inch, with up to ten rips/tears per vehicle (ten rips/tears considered part of normal duties/operation of vehicle), (2) seat rips/tears on seams, (3) soiled interiors with scratches on plastic components, (4) any and all damage/degradation to seatbelts, (5) damaged/degraded/missing tool kit for changing spare tire, and (6) missing ash trays, cigarette lighters or any other removable component (finding 7).

Although it is not the government's burden to prove that the damage was normal or fair wear and tear, the government's initial brief set forth in detail the vehicle damage identified on the inspection reports (sometimes also referred to as "inspection sheets"), concluding that none of the damage exceeded normal or fair wear and tear (gov't br. at 1-11). In contrast, TYD's reply brief set forth appellant's general disagreement with the government's conclusions, but provided no detailed discussion of whether the damage identified exceeded the contracts' stated definition of normal or fair wear and tear (app. reply at 4-9). A majority of TYD's conclusory statements concern damage to bumpers, running boards, exterior scratches, and interior tears. As noted above, exterior scratches, and interior stained and torn seats, are considered fair wear and tear, as are "any and all bumper damage" and "any and all damage to running boards" (*id.*). Although TYD references the inspection reports and accompanying photos upon which its claim is based (app. reply at 6-8), TYD's brief fails to include a comparison between the specific damage alleged and the contractual definitions of normal or fair wear and tear to establish that the damage exceeds those definitions (*see, e.g.*, app. reply at 15-17, 19).

Without any accompanying analysis by TYD establishing that, based upon the contractual definitions of normal or fair wear and tear, vehicle damage exceeded what contractually was considered normal or fair wear and tear, appellant's conclusory

14

statements fall far short of meeting appellant's burden of establishing governmental liability for vehicle damage. *Zafer Constr. Co.*, ASBCA No. 56769, 17-1 BCA ¶ 36,776 at 178,231 ("Counsel's unsupported argument is not proof"); *ECC Int'l LLC*, ASBCA Nos. 61176, 62029, 21-1 BCA ¶ 37,824 at 183,692 ("simply saying it does not make it so."). Instead, TYD argues that we should simply downplay the import of the contracts' definition of normal and fair wear and tear, or decline to apply those definitions in these appeals, under the guise of reading the contract as a whole and harmonizing "all provisions so that each part has reasonable meaning" (app. reply at 11 (citing *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). Here, reading the contract as a whole, there is no ambiguity regarding the definitions of normal and fair wear and tear or the meaning of those provisions. TYD's attempt to downplay the contracts' express terms, or read them out of the contracts, is rejected.

We are mindful of "the long-held principle that pleadings drafted by pro se litigants are generally held to 'less stringent standards' than pleadings filed by trained attorneys." *GLJ, Inc.*, 22-1 BCA ¶ 38,121 at 185,184 (quoting *Steffen v. United States*, 995 F.3d 1377, 1380 (Fed. Cir. 2021)) (additional citations omitted). "Although the Board accords pro se litigants leeway administratively, we still must apply the same legal standards to all parties." *Id.* (citation omitted). Based upon our review of the inspection reports and photographs we find that, applying the contracts' definitions of normal and fair wear and tear (findings 7, 14), the types of vehicle damage described in the inspection reports and seen in the photographs is, more likely than not, normal and fair vehicle wear and tear (findings 18-37) (scratches and chips on doors, deep scratches and cracks on the front and rear bumpers, dents, scratches on tailgates, scratches on mirror, visible stains on seats, missing lock on fuel tank door, broken cover to rear tools console, broken running board, damaged or missing tool kit).

IV. The COR's Review of Inspection Reports Does Not Bind Government to Pay Alleged Damages

TYD argues that the government "signed or acknowledged" the inspection reports and, as such, if the government "believed the listed condition was merely dust, dirt, soiling, decal residue, removable marks, or ordinary fair wear and tear, the Government had the opportunity to write that on the inspection documents or reserve its position at that time," and that the government's "later attempt to reclassify those same recorded conditions as dust, dirt, soiling, residue, or ordinary fair wear and tear is an after-the-fact litigation position and should be rejected" (app. reply at 2, 9). In other words, the government was bound by the inspection reports submitted when the vehicles were returned (finding 43). TYD seems to suggest that, upon return of the vehicles, there was some sort of meeting of the minds regarding noted damage to the vehicles being beyond normal and fair wear and tear (app. reply at 16-17). In its complaint, appellant alleges that "TYD and the Government conducted joint inspections at vehicle issue and at turn in," and that "[t]he inspection sheets were

signed by both parties and document vehicle condition at delivery and at return, including damage noted at turn in" (finding 43). Yet TYD offers no factual discussion or record evidence regarding the vehicle return process, nor does it identify any TYD employee who was actually present at the time of vehicle return, or who allegedly signed the inspection reports.

The government's answer admits that inspections were conducted when vehicles were returned, and, according to the government, the parties present were COR Leslie Ligot and a representative from Point Junction Car Rental" (*id.*). Based upon the government's representations, and our review of each of the inspection reports, we find it more likely than not that COR Leslie Ligot signed each of the inspection reports and, because no additional signatures appear on the inspection reports, no one from TYD signed the reports. The record does not reflect, however, who annotated the inspection reports listing vehicle damage (finding 18). Although we have concluded that the COR signed the inspection documents, even assuming for the sake of argument that the annotations likewise were provided by the COR and that an annotation could otherwise reflect an admission as to whether certain damage was other than normal fair wear and tear, both contracts state in no uncertain terms that a COR does not have authority regarding decisions with "funding implications" and that only the CO can legally bind the government (findings 4-5). Accordingly, only the CO - not the COR - had the authority to commit the government to pay additional funds under the contracts for vehicle damage determined to be other than normal or fair wear and tear. *Korea Eng'g Consultants Corp.*, ASBCA No. 61724, 20-1 BCA ¶ 37,538 at 182,286 (COR "who allegedly offered to reimburse appellant for its costs – lacked authority to make such an agreement or commit the government to the payment of funds"); *Matcon Diamond, Inc.*, ASBCA No. 59637, 20-1 BCA ¶ 37,532 at 182,261 n.11 (COR was "not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract"); 48 C.F.R. § 252.201-7000(b). Here, the CO determined "that the damages claimed by TYD Services fall within the scope of 'normal' or 'fair wear and tear' as defined by the contractual provisions" and, therefore, TYD was not entitled payment of additional funds (finding 40).

TYD argues that the contracts placed liability for vehicle damage "on the driver, and the drivers were Government personnel or Government-authorized users," noting that "TYD did not select those drivers, control those drivers, supervise those drivers, or have independent access to their identities" (app. reply at 1). TYD also argues that the government failed to cooperate by providing police reports that would document damage to the vehicles and allow TYD to submit vehicles to its insurance company for repairs (*id.* at 3, 12-13). The problem with TYD's arguments, however, is that the contracts placed responsibility on the driver, not the government, to provide police reports for all traffic incidents and failure to do so placed liability on the driver for the full repairs cost and full traffic incident cost (findings 9, 11). The contracts

16

simply did not place a blanket requirement upon the government to obtain police reports for every ding, dent, and scratch on the vehicle's exterior, or for every soiled or ripped seat in the vehicle's interior. (FOF ¶ 10). This especially is true given operation of the vehicles at Al Udeid Air Base in what the contracts - and the parties - recognized was an "austere environment" (finding 7-8). We decline to find such an implied duty here. *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010) (implied duty of good faith and fair dealing, i.e., duty to cooperate, "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions.").

TYD supplemented the Rule 4 file with documents suggesting that the government had requested copies of police reports involving vehicle accidents and traffic violations (see appendix to appellant's June 3, 2026, motion to supplement record, ex. A-C). According to TYD, these documents are relevant to "whether accident incidents occurred during performance and whether police reports were treated as required and billable in practice," including during closeout (app. supp. br. at 1-2 (undated but received June 4, 2026)). However, the contracts specifically provided for times in which, because of a vehicle accident, *the contractor* would notify the government of such accidents or violations, and *the contractor would be involved* in obtaining a police report (finding 9). Regarding traffic accidents with "Recordable Injuries or Illnesses or High Visibility Accidents, property damage equal to or greater than $2,000," the contracts placed responsibility on TYD to notify the COR and to ensure that recordable accident and property damage reports are complete and accurate (*id.*). The documents proffered by appellant do not in any way modify what is otherwise an unambiguous contract. Appellant's suggestion that the government's request that the contractor obtain a police report (app. reply at 13-14), does not thereby establish a common understanding between the parties or create an affirmative duty on the government to request and provide to TYD such reports where the contracts imposed no such duty. *IAP Worldwide Services, Inc.*, ASBCA No. 59397 *et al.*, 17-1 BCA ¶ 36,763 at 179,161 ("course of dealing must be reasonably construed to indicate the parties' intentions or provide 'a reflection of their joint or common understanding.'") (quoting *Tech. Sys.*, 17-1 BCA ¶ 36,631 at 178,387; *Sperry Flight Sys. v. United States*, 212 Ct. Cl. 329, 342, 548 F.2d 915, 923 (1977)).

The same is true to the extent TYD argues that ultimately the government is responsible for paying traffic fines because vehicles were driven by government employees (app. reply at 18-19) and, according to Jessica Tal, some fines were paid by the government (finding 44). The contracts specifically and clearly state that the government has no liability for traffic fines (finding 11). We reject TYD's attempt to impose upon the government such an obligation where no such duty exists.

<u>CONCLUSION</u>

Having considered all of appellant's contentions, we find that the claims lack merit.  Accordingly, the appeals are denied.

Dated:  July 8, 2026

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

DAVID D'ALESSANDRIS
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Order of Dismissal of the Armed Services Board of Contract Appeals in ASBCA Nos. 64429, 64430, Appeals of TYD Services, rendered in conformance with the Board's Charter.

Dated:  July 9, 2026

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

18